UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) Crim. No. 20-cr-10023-GAO |
| BERNARDITO CARVAJAL, | ) |
| | ) |
| Defendant. | ) |

## GOVERNMENT'S SENTENCING MEMORANDUM

In June 2019, the defendant Bernardito Carvajal sold drugs to the victim Richard Tonks 11 times. These drug deals, confirmed through text messages, phone calls, and historical cell site analysis culminated with the final drug deal on June 12, 2019, in which Carvajal sold Tonks cocaine and fentanyl. After purchasing these drugs, on the night of June 12 and early morning hours of June 13, 2019, Tonks spoke to his father and grandfather in the house they shared in Andover, Massachusetts. He spoke to his girlfriend, who was traveling in Asia, on Facetime. His last outgoing communication of any kind occurred at 2:01 a.m. on June 13, 2019. Later that day, Tonks failed to show up for work and did not answer any phone calls or text messages. Cell site analysis indicated that he never left his home that day. That night, Tonks's father, Philip Tonks, found Richard facedown and unconscious on his bed with a loaded needle next to his arm and called 9-1-1. Despite the efforts of the first responders and doctors after he was transported to the hospital, Richard Tonks never revived and was pronounced dead at 10:00 p.m. that night. The report from the Office of the Chief Medical Examiner confirmed that Tonks died of a drug overdose due to the combined effects of cocaine and fentanyl. Tonks's family members later found cocaine and fentanyl in his room and turned the drugs over to the police. Approximately six weeks after Tonks's death, the defendant agreed to sell fentanyl to an undercover officer and

1

was arrested following that drug deal. At trial, the defendant was convicted of distribution of fentanyl to Richard Tonks on June 12, 2019 and distribution of fentanyl to the undercover officer on July 31, 2019. Although the defendant was acquitted at trial of selling cocaine and of the death-resulting charges in the Indictment under the beyond-a-reasonable-doubt standard, the Court heard ample fact and medical evidence to support a finding at sentencing by a preponderance of the evidence that the defendant sold both fentanyl and cocaine to Tonks and those drugs caused his death. However, even if the Court finds that Carvajal sold only fentanyl to Tonks on June 12, 2019, as the jury did, the Court should still find that the fentanyl caused Tonks's death. Because the drugs dealt by the defendant caused Richard Tonks's death, at sentencing, this Court should grant an upward departure from the defendant's Guidelines Sentencing Range under U.S.S.G. § 5K2.1 and an upward variance under 18 U.S.C. § 3553(a) and sentence Carvajal to a term of imprisonment of 10 – 12 years (120 – 144 months) and three years of supervised release to follow his imprisonment.

## I. PROCEDURAL HISTORY

On January 29, 2020, a federal grand jury returned an Indictment charging the defendant with one count of distribution of fentanyl and cocaine resulting in death on June 12, 2019, and one count of distribution of fentanyl on July 31, 2019. Docket No. 13. The case proceeded to trial and on November 22, 2019, the jury found the defendant guilty of distribution of fentanyl on both June 12 and July 31, 2019. Docket No. 135. The jury acquitted the defendant on the charges of distribution of cocaine and the resulting death of the Richard Tonks. *Id.*

## II. ADVISORY SENTENCING GUIDELINES

### A. The Presentence Report

The Presentence Report ("PSR") prepared by the United States Probation Office ("USPO") found that the defendant was accountable for 55 grams of fentanyl and 19 grams of cocaine, for a total converted drug weight of 142 kilograms. PSR ¶ 36. The defendant's base offense level for that quantity of drugs is 24. PSR ¶ 37. Because the defendant has not accepted responsibility, the defendant's total offense level is 24. PSR ¶¶ 44-45. The defendant has a total criminal history score of zero, which places him in Criminal History Category I. PSR ¶ 50. The defendant's maximum sentence of imprisonment is 20 years. PSR ¶ 82. His Guidelines Sentencing Range ("GSR") is 51 – 63 months' imprisonment and there is a statutory mandatory minimum term of three years of supervised release. PSR ¶¶ 83, 85-87. Based on the drug weight attributable to the defendant, the government agrees with the USPO's calculation of the GSR. However, the government believes that an upward departure is warranted under U.S.S.G. § 5K2.1.

### B. Upward Departure Under U.S.S.G. § 5K2.1

At trial, the defendant was found not guilty of the death-resulting charge in the Indictment, but "[i]t is well settled that a sentencing proceeding differs from a trial." *United States v. Gonzalez-Vazquez*, 34 F.3d 19, 25 (1st Cir. 1994). "[A]n acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *United States v. Watts*, 519 U.S. 148, 156 (1997) (quoting *Dowling v. United States*, 493 U.S. 342, 349 (1990)). In fact, courts regularly consider acquitted conduct when determining an appropriate sentence. *See, e.g.*, *United States v. Cox*, 851 F.3d 113, 121 (1st Cir. 2017) ("Relevant conduct may include acquitted and uncharged

conduct."); *United States v. Desimone*, 699 F.3d 113, 128 (1st Cir. 2012) ("A court may consider acquitted conduct in determining the applicability vel non of a sentencing enhancement.") (internal quotation marks omitted); *United States v. Graham*, 146 F.3d 6, 11–12 (1st Cir. 1998) (affirming district court's consideration of related, acquitted conduct for the purposes of loss calculation at sentencing). Significantly, the prosecution must only prove facts upon which it relies at sentencing by a preponderance of the evidence. *United States v. Wright*, 873 F.2d 437, 441 (1st Cir. 1989) ("Case law clearly establishes that the government need not prove the facts used for sentencing beyond a reasonable doubt. The Supreme Court has held that the preponderance standard satisfies due process.") (internal quotation marks omitted).

      a. <u>The Drugs Dealt by the Defendant Caused Richard Tonks's Death.</u>

  The Court may find that the drugs sold by the defendant caused Richard Tonks's death under either of two independent theories. First, there is ample evidence to find that the defendant sold Tonks cocaine as well as fentanyl, and that those drugs in combination caused his death. Second, even if this Court finds that the defendant only sold Richard Tonks fentanyl, as the jury did, then based on both Dr. Capo-Martinez's and Dr. Bird's testimony, along with the overwhelming circumstantial evidence surrounding Richard Tonks's death, this Court should still find by a preponderance of the evidence that the fentanyl sold by the defendant caused Tonks's death.

  The jury found beyond a reasonable doubt that the defendant sold fentanyl to Richard Tonks on June 12, 2019, Docket No. 135, and at trial, the Court heard ample evidence to find by a preponderance of the evidence that the defendant also sold Richard Tonks cocaine in the days before his death. On January 23, 2019, Tonks requested "white" and then passed out in his bathroom after taking the drugs. When he awoke, he told his girlfriend over and over that he

4

thought he had taken cocaine. PSR ¶ 10. However, a toxicology screen at the hospital indicated that he had taken fentanyl. *Id.* Investigators testified at trial that "white" commonly means cocaine in street slang. PSR ¶ 9. Additionally, throughout the text messages extracted from Tonks's phone and admitted at trial, Tonks repeatedly asked for a "ball" or "3.5," which are references to an eighth of an ounce or an "8-ball" – a measurement for cocaine, not fentanyl. PSR ¶ 13. In fact, in the only instance in Tonks's entire phone extraction in which he mentions cocaine to someone other than Carvajal, he asked his friend Miles Brown for some "yayo." Brown immediately responded, "Not sure about that one man," and the two had no further communications that day. PSR ¶ 27. In the text exchange leading up to the final June 12, 2019 drug deal, in addition to the "3.5" or eight-ball of cocaine, Tonks asked Carvajal, "And can you do me one brown[?]" PSR ¶ 14. Investigators testified that "brown" is street slang for heroin or fentanyl. This June 12, 2019 drug deal was the final drug deal before Tonks died the next day of a drug overdose. Later, Tonks's family members found both fentanyl and cocaine in a cigar box in his bedroom and turned it over to police. PSR ¶ 26. Tonks had both fentanyl and cocaine in his bloodstream when he died. Given this evidence, in addition to the jury verdict that Carvajal sold fentanyl, the Court should make the finding that the defendant also sold cocaine to Richard Tonks on June 12, 2019.

There was also ample evidence presented at trial for this Court to find by a preponderance of the evidence that the drugs the defendant sold to Richard Tonks—fentanyl or fentanyl and cocaine—caused his death. At trial, Dr. Capo-Martinez, a pathologist at the Office of the Chief Medical Examiner ("OCME") testified that Richard Tonks died from acute intoxication due to the combined effects of cocaine and fentanyl. Trial Tr. at 3-122. She made this finding after conducting a toxicological screen, examining the body, reviewing medical

history, and evaluating the circumstances of Richard Tonks's death. She stated: "It's just an overwhelming amount of findings that lead you to believe this will be an overdose death. I have no reason to suspect anything other than that." *Id.* at 3-127. Dr. Capo-Martinez also stated that either the fentanyl or cocaine could have killed Tonks because she could not separate out the effects of the two drugs: "Either/or can be lethal on their own. Fentanyl, again, is a drug of abuse. It can cause death on its own. And cocaine, either short-term use or long-term use, can also cause death by different ways . . . ." *Id.* at 3-131-32. She continued, "This is a pretty routine case for us. Unfortunately, we do see a lot of deaths by overdose in our office, especially with fentanyl." *Id.* at 3-132.

Dr. Steven Bird, a board-certified toxicologist and emergency room physician, who regularly treats patients with opioid overdoses in his practice, narrowed Richard Tonks's cause of death to a fentanyl overdose. He based his opinion on "the lethal level of fentanyl in his blood," "the needle in his arm or immediately next to him," and the fact that Tonks was "otherwise a healthy 26-year-old." *Id.* at 4-50. At trial, defense counsel conceded that Richard Tonks probably died of a drug overdose. When describing the overdose, defense counsel stated: "That is this case. There is a probable outcome. You stumble upon a person who is a long-term drug addict, who is in a bed with a needle by his arm. I agree, every expert agrees he probably died of a drug overdose. And if that was the only standard for you, then this case would be over, but it's not." *Id.* at 5-38-39. Given the expert testimony and the defendant's admissions, there is ample evidence for this Court to find that the drugs the defendant sold—fentanyl or fentanyl and cocaine—caused Richard Tonks's death.

      b.   <u>An Upward Departure under U.S.S.G. § 5K2.1 is Warranted.</u>

Because the drugs sold by the defendant were the cause of Richard Tonks's death, this Court should upwardly depart from the applicable GSR under U.S.S.G. § 5K2.1: "If death resulted, the court may increase the sentence above the authorized guideline range." "Because a departure can only be imposed pursuant to the framework set out in the Guidelines, a departure sentence must satisfy whatever criteria the particular departure guideline entails." *United States v. Heindenstrom*, 946 F.3d 57, 61–62 (1st Cir. 2019) (internal quotation marks and citations omitted). In *Heindenstrom*, the First Circuit analyzed whether the district court needed to find causation by the strict "but-for" causation standard promulgated in *Burrage v. United States*, 571 U.S. 204 (2014) to apply an upward departure under U.S.S.G. § 5K2.1. *Id.* at 62. Ultimately the First Circuit did not resolve this question but upheld an increased sentence for a drug trafficker based on the resulting death of his drug customer as an upward variance under 18 U.S.C. § 3553(a). *Id.* at 63 – 64. This Court need not decide the issue of whether but-for causation is required under U.S.S.G. § 5K2.1, because under any causation standard, the Court has ample evidence to find by a preponderance of the evidence that the fentanyl and cocaine (or the fentanyl alone) was the cause of Richard Tonks's death. An upward departure is therefore appropriate.

In facts similar to the present case, the Fourth Circuit in *United States v. McKinnie* upheld the district court's increased sentence based on U.S.S.G. § 5K2.1 using the "but-for" standard of causation: "Finally, on the basis of the court's conclusion that [Defendant] sold 'this' fentanyl to [Victim] on the night before his death, the 'shocking' level of fentanyl in [Victim's] body, and the testimony that [Victim] was alive the next morning when his roommate left, the court found that departures under U.S.S.G. § 5K2.1 (Death) and U.S.S.G. § 5K2.21 (Uncharged

Conduct) were warranted." 21 F.4th 283, 291 (4th Cir. 2021). Moreover, even though the defendant may not have intended to cause Tonks's death, "these circumstances are only mitigating factors to be considered in deciding whether and to what extent to depart upward." *United States v. Nossan*, 647 F.3d 822, 827 (8th Cir. 2011) (citing *United States v. Diaz,* 285 F.3d 92, 101 (1st Cir.2002) ("We see no basis for foreclosing departure under § 5K2.1 when a defendant puts into motion a chain of events that risks serious injury or death, even when an intent to harm is entirely absent and the defendant was not directly responsible for the death.")). It would strain credulity to believe that in the current opioid crisis, this defendant did not know that he was selling a deadly product – fentanyl. *See United States v. Mousseau*, 517 F.3d 1044, 1049 (8th Cir. 2008) (affirming an upward departure under § 5K2.1 despite the fact that "the facts do not show that [defendant] intended to harm C.W., it is clear that her actions were very dangerous and that she disregarded a known risk by giving an unknown substance, suspected to be a narcotic, to a minor to ingest").

    Here, because the drugs the defendant sold to Richard Tonks the night before he died caused his death, a sentence of 10 – 12 years is reasonable. As calculated by the USPO, the defendant's total offense level is 24 and his GSR is 51 – 63 months. PSR ¶¶ 42, 83. A sentence of 10 – 12 years (120 – 144 months) represents an upward departure of approximately 8 levels (total offense level 32, 121 – 151 months). This upward departure is reasonable under the circumstances, grounded in the language of the Sentencing Guidelines, and comparable or lower than sentences other courts have imposed in similar drug overdose death-resulting cases. *See, e.g.*, *McKinnie*, 21 F.4th at 288 (GSR of 21 – 27 months, sentence of 120 months, 15-level upward departure); *Heindenstrom*, 946 F.3d at 61 (GSR of 8 – 14 months, sentence of 60 months, 14-level upward departure, although affirmed as a variance); *United States v. Waver*,

754 F. App'x 56, 57 (2d Cir. 2019) (GSR of 33 – 41 months, sentence of 84 months, eight-level upward departure, although affirmed as a variance); *Nossan*, 647 F.3d at 825 (GSR of 10 – 16 months, sentence of 60 months, 12-level upward departure); *United States v. Bollinger*, 893 F.3d 1123, 1124 – 25 (8th Cir. 2018) (GSR of 6 – 12 months, sentence of 130 months, 22-level upward departure).

This Court should find that the drugs the defendant sold to Richard Tonks caused his death and upwardly depart from the defendant's GSR approximately 8 levels for a sentence of imprisonment of 10 – 12 years (120 – 144 months).

### III.   UPWARD VARIANCE UNDER 18 U.S.C. § 3553(a)

Consideration of the § 3553(a) factors demonstrates that an upward variance is appropriate and that a sentence in the range of 120 – 144 months' imprisonment is sufficient, but not greater than necessary, to meet the goals of sentencing. "A variant sentence, unlike a departure, is not hemmed in by the language of a particular guideline. Instead, it is a product of the sentencing court's weighing of the myriad factors enumerated in 18 U.S.C. § 3553(a)." *Heindenstrom*, 946 F.3d at 63. "The distinction between variances and departures matters. Even if the but-for causation standard applies to a sentencing departure under the Guidelines [U.S.S.G. § 5K2.1], it is not similarly required for an upward variance under § 3553(a)." *McKinnie*, 21 F.4th at 290. In fact, in *Heindenstrom*, the First Circuit rejected the argument that an upward variance based on a resulting overdose death required a "strict but-for causal chain," and ruled that "[a]lthough the tie [to the offense of conviction] fell short of strict but-for causation, no authority prohibits a sentencing court contemplating a variant sentence from using harm as a factor in the absence of such causation." 946 F.3d at 64. "The short of it is that section 3553(a) broadly invites a sentencing court to consider relevant and reliable information concerning the

offense of conviction." *Id.* Therefore, even if this Court determines that the government has not met the standard of strict but-for causation that may be required for an upward departure under U.S.S.G. § 5K2.1, it should still sentence the defendant to 10 – 12 years in prison pursuant to an upward variance under 18 U.S.C. § 3553(a).

A. **Nature of the Offense**

This Court is well aware that fentanyl is a deadly drug that has wreaked havoc in the United States, and more specifically in Massachusetts, over the past several years. Fentanyl remains the primary driver behind the ongoing opioid crisis, with fentanyl involved in more overdose deaths than any other illicit drug.[1] "Nearly 70 percent of all drug overdose deaths in the United States in 2018 involved an opioid."[2] "Fentanyl use and overdose deaths are more widespread across the country as the opioid crisis continues. Overall, fentanyl-involved deaths are still the most concentrated in states in the Great Lakes and Northeast of the United States."[3] Massachusetts has been one of the states hardest hit by the opioid crisis and was among the top five states with the most fentanyl reports in 2019.[4] In 2018, about 88% of drug overdose deaths in Massachusetts involved at least one opioid.[5] "The overdose crisis in the United States claims more lives each year than firearms, suicide, homicide, or motor vehicle crashes."[6]

---

[1] U.S. Department of Justice Drug Enforcement Administration, *2020 National Drug Threat Assessment*, available at https://www.dea.gov/documents/2021/03/02/2020-national-drug-threat-assessment#:~:text=The%202020%20National%20Drug%20Threat%20Assessment%20%28NDTA%29%20is,laundering%20of%20proceeds%20generated%20through%20illicit%20drug%20sales., at 7 (last visited February 24, 2022) (hereinafter "DEA 2020 Assessment").
[2] *Id.*
[3] *Id.* at 12.
[4] *Id.* at 8.
[5] National Institute on Drug Abuse, *Opioid-Related Overdose Deaths* (Revised April 2020), available at www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/massachusetts-opioid-summary (last visited on February 24, 2022).
[6] United States of America Commission on Combating Synthetic Opioid Trafficking, Final Report (Published February 2022), available at https://www.rand.org/content/dam/rand/pubs/external_publications/EP60000/EP68838/RAND_EP68838.pdf, at vii (last visited February 24, 2022).

As this case shows, these statistics are not hypothetical. Fentanyl kills victims like Richard Tonks every day in this country. "The opioid epidemic has wrought a terrible toll on our nation and so many communities within it." *McKinnie*, 21 F.4th at 294 (citing Roni Caryn Rabin, *Overdose Deaths Reached Record High as the Pandemic Spread*, N.Y. Times (Nov. 17, 2021) (describing more than 100,000 overdose deaths between April 2020 and 2021, primarily driven by fentanyl)). The epidemic is real and being felt every day by families across Massachusetts and New England. The defendant's crimes played a direct role in these grim statistics. The nature of the defendant's offenses, dealing deadly drugs to Richard Tonks, a young man struggling with drug addiction, and ultimately killing him, warrant an upward variance and a significant sentence of imprisonment.

### B. Specific and General Deterrence and Protection of the Public

A significant sentence of imprisonment is warranted to deter others from becoming involved in any way, role, or capacity in the trafficking of fentanyl, as the dangers associated with this deadly drug cannot be overstated. Individuals tempted to engage in drug trafficking must understand that *any* involvement with fentanyl, no matter how minimal, will have immediate and serious consequences. Based on the facts of this case, it is abundantly clear that fentanyl kills people, and those that choose to peddle it, no matter what quantity or where they stand in the hierarchy of their drug-trafficking organizations, are putting lives at risk every day. Imprisonment is necessary to send a strong warning to others who might otherwise consider possessing or distributing this dangerous drug.

Considerations of specific deterrence also support the imposition of a sentence of 10 – 12 years' imprisonment. At trial, the government admitted evidence showing that after purchasing fentanyl from the defendant on January 23, 2019, Richard Tonks stopped buying drugs from him

until June 4, 2019. Tonks was sober for several months and was trying hard to stay clean and avoid using drugs. Tonks efforts did not stop the defendant from soliciting him. The defendant continually reached out to Tonks offering to sell him drugs over and over until finally, Tonks succumbed to his addiction and agreed. Ultimately, the June 4, 2019 drug deal started the chain of 11 drug purchases that led to Tonks's death on June 13, 2019. Moreover, the defendant seems to have learned that Richard Tonks died shortly after Tonks's overdose. The defendant sent a text message to Tonks on June 14, 2019 asking if he was okay. The defendant never received an answer and he removed both Richard Tonks and his girlfriend from his Facebook account days later. Despite knowing that the drugs he sold killed one of his customers, the defendant did not stop, or even pause, his drug sales. Through text messages with different drug customers, it is clear that the defendant continued to sell both cocaine and fentanyl to others from the time Richard Tonks died on June 13, 2019 until just hours before he was arrested after selling fentanyl to an undercover officer on July 31, 2019. This is not the behavior of someone who was ever going to stop peddling poison on his own. There is no telling the damage the defendant could have caused if he had not been arrested. A significant sentence of imprisonment is necessary to deter this defendant from ever selling these deadly drugs again and to protect the public.

## IV. CONCLUSION

Because the drugs the defendant sold to Richard Tonks caused his death, this Court should grant an upward departure under U.S.S.G. § 5K2.1 and an upward variance under 18

U.S.C. § 3553(a) and sentence the defendant to a term of imprisonment of 10 – 12 years (120 – 144 months) and three years of supervised release.


February 25, 2022                              Respectfully submitted,

                                               RACHAEL S. ROLLINS
                                               United States Attorney

                                      By:      /s/ Stephen W. Hassink
                                               Elysa Q. Wan
                                               Stephen W. Hassink
                                               Assistant U.S. Attorneys


                        CERTIFICATE OF SERVICE

   I, the undersigned, hereby certify that I have served this sentencing memorandum on all appropriate parties through email on February 25, 2022.

                                               /s/ Stephen W. Hassink
                                               Stephen W. Hassink
                                               Assistant U.S. Attorney